Donald G. COOPER,
Plaintiff-Respondent,

v.

ANSCHUTZ URANIUM
CORPORATION,
Defendant-Appellant.

Nos. 42584, 42585.

Missouri Court of Appeals,
Eastern District,
Division Four.

Sept. 15, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 20, 1981.

C. Perry Bascom, Thomas C. Walsh, Gregory D. Willard, St. Louis, and Walter S. Drusch, Jr., Cape Girardeau, for defendant-appellant.

Robert M. Johnson, Patrick M. Ardis, Henry W. Jones, III, Memphis, Tenn. and Edward E. Calvin, Cape Girardeau, for plaintiff-respondent.

SATZ, Presiding Judge.

This is a consolidated appeal. Defendant, Anschutz Uranium Corporation, appealed from a summary judgment entered against it in a quiet title action and also appealed from an order in another action permanently enjoining it from entering onto the parcel of land which was the subject of the quiet title action. The appeals were consolidated because the actions below were centered on the same basic issue. In this consolidated appeal, we reverse and remand the separate judgments of the trial court.

The dispute here is over the ownership of piles of slag, tailings, soil samples and borings located on the subject parcel. Both plaintiff, Donald Cooper, and defendant, Anschutz Uranium Corporation, trace their ownership to the same original grantor, the Missouri Cobalt Company (MCC). In 1952, MCC owned the subject parcel in fee. In April 1952, MCC conveyed the "surface rights only" in the parcel to National Lead Company (National Lead) and specifically excepted from this conveyance the "stockpiles of mineral products now lying on the surface of the ... described real estate." This conveyance commenced plaintiff's chain of title. National Lead then conveyed the rights it had obtained to the United States Government. This conveyance again specifically excepted the "stockpiles." In 1961, the U.S. Government quitclaimed its interest to Perry Equipment Corporation and Perry's successor transferred "the surface rights only" to plaintiff. To plaintiff, the phrase "stockpiles of mineral products", as used in the 1952 deed, did not encompass the piles of material in issue; rather, plaintiff concluded these materials were not retained by MCC and were effectively transferred to plaintiff's predecessor in title and ultimately to plaintiff by the transfer of the "surface rights" in the 1952 deed and the deeds which followed.

From a different series of deeds, defendant reached the opposite conclusion. Defendant concluded the stockpiles retained by MCC did include the piles of material in issue and, therefore, plaintiff could not have received proper title to these materials. Defendant laid claim to the stockpiles through a chain of title traced to MCC, the same source as plaintiff's claim. In 1957, MCC conveyed to National Lead the stockpiles previously excepted from its 1952 deed along with all underground and mineral rights to the subject parcel.[1] This commenced defendant's chain of title. Through several subsequent deeds, this interest was conveyed to the Nedlog Development Co., along with the explicit "right, title and interest, if any, of Grantors in and to all mine tailings, mine and smelter wastes, smelter slag and other industrial waste deposits ...."[2] Nedlog then conveyed its

---

1. This conveyance occurred after National Lead had conveyed the surface rights to the land to the U.S. Government. Thus, after the 1952 conveyance by MCC, there was no unity of ownership of the subject parcel.

2. National Lead Industries, Inc., a successor corporation to National Lead Co., conveyed all of National Lead's interest to a Silas and Mabel Dees and John and Hazel Walker, granting each couple a "one-half undivided interest" in the parcel. Later, the Walkers conveyed their interest to the Dees. Then, by warranty deed, the Dees conveyed "all of the underground mineral, water and mining rights" in the subject parcel to Nedlog Development Co. On the same date, the Dees quitclaimed to Nedlog "all right, title and interest, if any, of grantors in and to all mine tailings, mine and smelter wastes, smelter slag and other industrial waste deposits."

interest in the property to defendant. This conveyance included "[a]ll mineral rights and rights of ingress, egress and regress" as well as "all mine tailings, mill and smelter wastes, smelter slag and other industrial waste deposits ... situated on the above tracts of land ...."

Based upon his interpretation of the interest conveyed by the various deeds, plaintiff initiated his quiet title action seeking a declaration of his fee ownership to the surface rights and the piles of material in question. Defendant answered and, by counterclaim, sought a declaration of its ownership to the materials in issue. Plaintiff's motion for summary judgment followed and, based upon the noted deeds as well as affidavits and correspondence, the trial court entered a summary judgment for plaintiff and dismissed defendant's counterclaim. In a companion suit, in which plaintiff had asserted the same property interest he had asserted in the quiet title action, the court permanently enjoined defendant from "trespassing and entering upon" the subject parcel.

█ Defendant first attacks the summary judgment. Defendant contends judgment should have been entered for it rather than for plaintiff because, as a matter of law, the record reveals the piles of material in issue were part of the mineral rights conveyed to defendant. Alternatively, defendant contends there were genuine issues of material fact, making summary judgment inappropriate. We disagree with defendant's first contention and agree with its second.

The resolution of this dispute turns on the meaning of the phrase used by MCC in commencing each party's chain of title: "stockpiles of mineral products now lying on the surface of the ... described real estate." The meaning of this phrase is determined from the intent of MCC. *See Julius v. Buckner*, 452 S.W.2d 139, 141 (Mo. 1970). In its conveyance to plaintiff's predecessor in title, MCC excepted the "stockpiles of mineral products ...." If MCC did not intend the phrase to encompass the piles of material in question, the

material was not excepted from the 1952 conveyance and, ultimately, the material was conveyed to plaintiff as part of the surface rights. If, on the other hand, MCC did intend the phrase to encompass the piles of material, the material was specifically excepted from the surface rights ultimately obtained by plaintiff and plaintiff has no claim to the material.

The intent of a grantor, like MCC, is a fact. It may be determined from the deed itself if the language of the deed is unambiguous. *See Wolf v. Miravalle*, 372 S.W.2d 28, 34 (Mo.1963). In these instances, summary judgment may be appropriate, for the court simply resolves the issue of fact—intent—from unambiguous language. *Adzick v. Chulick*, 512 S.W.2d 194, 197 (Mo.App. 1974); *Renois v. DiFranco*, 512 S.W.2d 411, 413 (Mo.App.1974). However, where the language of the deed is ambiguous, the propriety of a summary judgment is questionable. *National Merchandising Corp. v. McAlpin*, 440 S.W.2d 489, 494 (Mo.App. 1969). In these instances, the grantor's intent must be established by extrinsic evidence, *see, e.g., Cure v. City of Jefferson*, 380 S.W.2d 305, 311 (Mo.1964) and, in a summary judgment proceeding, extrinsic evidence rarely provides the unassailable proof essential to resolve the factual issue of intent. Rule 74.04(h); *See National Merchandising Corp. v. McAlpin, supra*, at 494. The present case is not one of those rare instances. The grantor's intent was not established by unassailable proof.

Although both parties argue the phrase in question is unambiguous, each party derives from that phrase an intent of the grantor opposite to the intent derived by the other party. To construct these opposing derivations of intent, both parties use logic almost solely supported by evidence extrinsic to the deed containing the phrase in question.

Plaintiff argues the phrase "stockpiles of mineral products ..." had a precise and explicit meaning to MCC, the original/common grantor. According to plaintiff, MCC carefully chose this phrase because, to MCC, the phrase did not include the piles of mate-

rial in question. Plaintiff bases his argument on MCC's use of similar language in a lease entered into between MCC and St. Louis Smelting Co. In 1942, MCC leased the parcel in question for 10 years to St. Louis Smelting Co. for prospecting and for mining ore. In the lease, MCC retained the rights to all "stockpiles" it had placed on the parcel. St. Louis Smelting received the rights to that surface which would be necessary for "stock-piles, dumps, ditches, dam, ponds, drains, roads, tailings . . .", provided that "tailings, sands, rock and other residue resulting" from the operation and left on the land became the property of MCC. In addition, the lease provided that "[s]tockpiles of concentrates unsold at the termination" of the lease would belong in part to St. Louis Smelting and in part to MCC.

From MCC's separate use of the words stockpile and tailings in the lease, plaintiff reasons that MCC clearly recognized and explicitly made a distinction in the lease between "stockpiles" and "trashpiles." According to plaintiff, the terms "stockpiles" and "trashpiles", as used in the lease, defined mutually exclusive kinds of material. "Stockpiles" included "processed" material—the "processed" ore concentrate referred to in the lease and the unspecified stockpiles retained by MCC in the lease; the latter, according to plaintiff, existed at the beginning of the lease and consisted of metal castings, cathodes, anodes and other similar products. "Trashpiles" were piles of tailings and slag. Thus, according to plaintiff, these mutually exclusive categories had been defined by the terminology of the lease when MCC executed its 1952 deed to National Lead. Plaintiff then argues MCC used the same basic terminology in the deed that it had used in the lease and, thus, the terminology in the deed had the same meaning the terminology had in the lease. In the deed, MCC retained the rights to the "stockpiles of mineral products now lying on the surface." By using the definition of "stockpiles" established in the lease, plaintiff finds MCC intended to retain only the piles of metal castings, cathodes and anodes or piles of ore concentrate and did not intend to retain the piles of slag and tailings.

The piles of slag and tailings, therefore, were conveyed to National Lead, plaintiff's predecessor in title, and ultimately to plaintiff as a part of the surface rights to the land.

Plaintiff's carefully constructed argument has surface appeal. It has, however, defects fatal to this summary judgment proceeding. Plaintiff limits the definition of "stockpiles of mineral products" to piles of "processed mineral products", consisting of metal castings, cathodes and anodes, and piles of ore concentrates. If plaintiff is correct, piles of either or both of these materials necessarily existed in 1952, because MCC retained the right to those stockpiles of mineral products then "*lying on the surface.*" However, there is no evidence these stockpiles existed in 1952. Plaintiff attempts to fill this void by relying on an affidavit of Harry Krueger, who, in 1952, was employed by National Lead, the grantee of the 1952 conveyance. Plaintiff's reliance is misplaced. In his affidavit, Krueger clearly states "*[t]he only piles located on [the subject] lands were . . . slag piles,* although there were other materials of a different character on [the] lands . . . . These materials consisted of metal castings, cathodes, anodes and residues produced during the World War I era." (Emphasis added). Sensibly read, this statement contradicts plaintiff's position. At best, the statement is equivocal about the existence of "stockpiles" of metal castings, cathodes and anodes. Also, there was no evidence of stockpiles of ore concentrate existing in 1952. The 1952 deed was made broadly "subject to" the rights obtained by St. Louis Smelting Co. in the 1942 lease. Presumably, this would include the right of St. Louis Smelting to remove stockpiles of ore concentrates on the land for one year after the 1952 termination of the lease. From this, plaintiff apparently reasons there were stockpiles of ore concentrates on the land in 1952. However, there were other rights secured by the lease which the deed could have been "subject to." This broad and non-specific provision in the deed does not necessarily imply there were piles of ore

concentrates "lying on the surface" at the time the deed was executed.

Furthermore, plaintiff can draw no real comfort from MCC's separate use of the terms "stockpile" and "tailings" in the lease and MCC's failure to do so in the 1952 deed. On the present record, "stockpiles of mineral products", as used in the deed, could have been used in its generic sense to include slag, tailings and boring. Plaintiff, himself, points out a dictionary definition of stockpiles which defines stockpiles as "a reserve supply of raw materials or goods." Thus, the "stockpiles of mineral products" must refer to mineral products which are raw materials. The piles of "slag, tailings and borings" unarguably are composed of minerals, are close to nature and, thus, fit the description of raw materials with as much sense, if not more, as plaintiff's metal castings, cathodes and anodes fit the description. The latter materials, after all, are manufactured products and are "raw materials" only in the sense they may be used as the basic materials for even more complicated manufactured products.

Plaintiff also argues his interpretation is borne out by other statements in Krueger's affidavit. Krueger stated that National Lead did not exhibit any interest in acquiring the slag piles. Therefore, plaintiff reasons, Krueger indicated the slag piles had no value and MCC could not have intended to retain valueless material. Krueger's statement does not compel plaintiff's inference. There is no evidence the state of the art at that time precluded the recovery of valuable minerals from the slag piles in issue. Krueger also stated that in 1952 National Lead owed MCC money and MCC intended to retain any rights to minerals of value. Therefore, plaintiff reasons, if MCC had suspected the slag and tailings to be of value, it would have copied into its conveyance the appropriate language available

from its own lease and would have explicitly reserved to itself not only "stockpiles of mineral products" but also stockpiles of slag and tailings. Again, plaintiff's inference is not compelled by Krueger's statement. As noted, MCC could well have wanted to retain the rights to all mineral products and used the phrase in question in its generic sense to achieve that end. If MCC were to be as literal minded, precise and explicit in its deed as plaintiff urges MCC to have been in its lease, then, in its deed, MCC would simply have listed the specific stockpiles it was retaining—ore concentrates, manufactured metal products, such as metal castings, cathodes and anodes—and would have specifically excluded the piles of tailings and slag.

Plaintiff's argument may be a reasonable presentation of the record. The record, however, fails to provide plaintiff with the unassailable proof necessary to resolve the factual issue of intent in this summary judgment proceeding. *Peer v. MFA Milling Co.*, 578 S.W.2d 291, 292 (Mo.App.1979). Thus, the summary judgment for plaintiff was inappropriate.

Like plaintiff, defendant argues the phrase in question is unambiguous and, like plaintiff, defendant argues the phrase reflects an intent of the grantor which requires judgment in its favor as a matter of law. Like plaintiff, defendant bases its argument on the 1942 lease between MCC and St. Louis Smelting Co. and the Krueger affidavit.[3] Like plaintiff, defendant fails to resolve the factual issue of intent by unassailable proof, *Peer v. MFA Milling Co., supra* at 292, and, like plaintiff, defendant is not entitled to summary judgment.

■ Defendant also attacks the permanent injunction entered against it and does so on several different grounds. We address only the determinative ground. To understand this ground, we first set out the

---

**3.** In the 1942 lease, MCC retained the rights to the residue from the mine operations. From this, defendant reasons MCC considered the residue valuable. Then, relying on Krueger's statement that MCC intended to retain anything of value, defendant argues that MCC intended to retain ownership of this valuable residue, i.e. the piles of slag and tailings. Also, defendant isolates Krueger's statement that the only piles on the land in 1952 were "slag piles." From this, defendant concludes the retention of "stockpiles . . . now lying on the surface" could only refer to the slag piles.

short procedural history of the permanent injunction action.

On October 18, 1979, in a companion suit to the quiet title action, plaintiff filed a verified petition requesting the court to temporarily restrain and then permanently enjoin defendant from entering on to the land which was also in issue in the quiet title action. On the same day, the court entered an ex parte temporary restraining order against defendant and also ordered defendant to show cause why a temporary injunction should not issue. On the return date, November 15, 1979, the parties appeared and continued the cause until December 20, 1979, the date plaintiff's motion for summary judgment in the quiet title action was to be heard. Defendant did not file a return to the show cause order nor did it file an answer to plaintiff's petition. From the record before us, it appears this cause was called on December 20 for hearing on the show cause order. There is no indication in the record that an evidentiary hearing was conducted.[4] The court then took "the matter under advisement" and continued the temporary restraining order in effect. Subsequently, on the same date the court entered summary judgment for plaintiff in the quiet title action, the court entered a permanent injunction against defendant.

Defendant suggests the court committed prejudicial error in granting a permanent injunction against it without a proper hearing. We agree.

From the record, it is clear defendant was ordered to appear for a specific purpose—to show cause why a temporary injunction should not issue. Apparently, defendant appeared for that purpose. Only the issue of granting or denying a temporary injunction was then before the court for adjudication. The court specifically acknowledged this in its order of December 20. However, in the face of this limited issue, the court proceeded to adjudicate the action on the merits of the permanent injunction and, from the record, it apparently did so without notice to defendants.

It is questionable whether the court had authority to advance the action on the merits and consolidate it with the show cause hearing without prior notice to defendant. See Simms v. Ford Motor Credit Co., 605 S.W.2d 212, 214 (Mo.App.1980) and Bayer v. Associated Underwriters, Inc., 402 S.W.2d 11, 13 (Mo.App.1966) (error for trial court to dismiss petition for injunction at show cause hearing for temporary injunction); Acha v. Beame, 531 F.2d 648, 651 (2d Cir. 1976); Dry Creek Lodge, Inc. v. United States, 515 F.2d 926, 935–936 (10th Cir. 1975); But see present Rule 92.02(a)(2); and see e.g., Atlantic Richfield Co. v. F.T.C., 546 F.2d 646, 651 (5th Cir. 1977).[5] However, assuming, without deciding, the court had this authority, the court still was obliged to inform defendant during the course of the hearing that the action on the merits was being advanced and consolidated and, thus, afford the defendant the opportunity to present its case on the merits.

4. The Court's order entered on its Docket Sheet reads:

"Come now the parties with their respective counsel for argument on Petitioner's Motion for Temporary Restraining Order & Show Cause hearing. Argument thereon & the Court takes the matter under advisement. The T.R.O. heretofore entered shall remain in full force and effect during the period of time this litigation is in process. So Ordered."

5. At the time of the hearing below, former Rule 92 (92.01–92.20), Injunctions, was in effect. Those rules were silent about advancement and consolidation. Present Rule 92.02(a)(2) copies Rule 65(a)(2), Fed.R.Civ.Proc., and provides: "Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application." Because the Federal Rule provides advancement and consolidation may be ordered "after the commencement of the action", the Rule has been interpreted to mean that no notice of advancement and consolidation need be given prior to the hearing on the preliminary injunction, but, if given during the hearing, the notice still must be sufficient to protect the party's right to a full hearing on the merits. 7 Moore Federal Practice, § 65.04[4] and cases collected therein. This does not square with the prior notice required by the 2d and 10th Circuits in Acha v. Beame, supra, and Dry Creek Lodge, Inc. v. United States, supra.

*See, e.g., Puerto Rican Farm Workers v. Eatmon,* 427 F.2d 210, 211 (5th Cir. 1970). The record does not show this requirement was met. Arguably, in the present case, the prejudice worked by this failure is not self-proving. *See Atlantic Richfield Co. v. F.T.C., supra* at 651 and cases cited therein. Defendant here did not file an answer and, thus, could be held to have admitted the traversable allegations in plaintiff's verified petition. *See, e.g., Sumpter v. J. E. Sieben Construction Co.,* 492 S.W.2d 150, 153 (Mo. App.1973). However, on the present record, the failure to file an answer is effective as an admission only if plaintiff objected to the failure. *Cf. Pleiman v. Belew,* 360 Mo. 219, 227 S.W.2d 733, 735 (1950); *Walker v. Huddleston,* 261 S.W.2d 502, 505 (Mo.App. 1953). Although the filing of an answer is mandatory, this requirement is waived unless the opposing party requests enforcement of the requirement by timely and proper action. *Gregg v. Johnston,* 546 S.W.2d 754, 756 (Mo.App.1977); Rule 55.09; *Cf. Bailey v. Bailey,* 317 S.W.2d 630, 632 (Mo.App.1958); *Pleiman v. Belew, supra.* The record does not show plaintiff objected to defendant's failure to file an answer by seeking a default judgment or otherwise.

Finally, it is possible to construe the record as showing plaintiff proceeded to trial on the merits as if a proper answer had been filed. If the record is so construed, then, clearly the judgment was erroneous. A proper answer would have joined factual issues which, in this injunction action, should not be resolved merely on a verified petition.

Summary Judgment in Cause No. 42585 is reversed and cause remanded. Judgment granting permanent injunction in Cause No. 42584 is reversed and cause remanded.

SMITH and SIMON, JJ., concur.